**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ROMEO VALENTINO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:08CV0480 AGF |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This action is before this Court[1] for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Romeo Valentino was not disabled

and, thus, not entitled to disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-434, or supplemental security income ("SSI") under Title XVI of

the Act, id. §§ 1381-1383f. For the reasons set forth below, the decision of the

Commissioner shall be reversed and the case remanded for further consideration.

Plaintiff, who was born on February 1, 1958, filed for disability insurance benefits

and SSI on December 10, 2003. Those applications were denied on May 6, 2004, and

Plaintiff took no further action. He filed the current applications on March 28, 2006, at

the age of 47, alleging a disability onset date of April 2, 2004, due to depression, anxiety,

back pain, hypertension, hepatitis C, and arthritis. After Plaintiff's applications were

---

[1]     The parties have consented  to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

denied at the initial administrative level, he requested a hearing before an Administrative

Law Judge ("ALJ") and such a hearing was held on October 4, 2007.  By decision dated

October 18, 2007, the ALJ found that Plaintiff had the residual functional capacity

("RFC") to perform his past relevant work as a bus driver.  Plaintiff's request for review

by the Appeals Council of the Social Security Administration was denied on February 21,

2008.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision

stands as the final agency action now under review.

Plaintiff argues that the ALJ erred in assessing Plaintiff's RFC by failing to

include Plaintiff's limited range of motion of his back and left ankle, knee, and shoulder.

Plaintiff also argues that the ALJ erred in failing to include any mental limitations in the

RFC assessment, and in failing to consider the mental demands of Plaintiff's past work.

Plaintiff asks the Court to reverse the decision of the Commissioner and remand the case

for further consideration.

## BACKGROUND

### Work History

On a Disability Report Plaintiff listed seven jobs he had held in the previous 15

years.  Five of those jobs were as a laborer/factory worker and two were as a bus driver.

Each of the bus driver jobs, one lasting from 1989 to 1993 and the other from 2001 to

2002, paid $10 per hour and required five eight-hour shifts per week.  In 1999, he worked

as a groundskeeper at a cemetery.

## Medical Record

The record indicates that in 1999, Plaintiff fell into a grave while working at the cemetery, fracturing three ribs, his left ankle, and injuring his back. He had surgery on his left ankle, and also at some point had arthroscopic surgery on both knees. Id. 190, 254. In addition, in April 2005, the Department of Veterans Affairs rated Plaintiff 10 percent disabled due to hypertension. Id. 244.

On July 18, 2005, Plaintiff was admitted to the Veterans Administration Medical Center after an attempted suicide. He reported a history of anger and auditory hallucinations, and violent behavior over the past ten days, having stabbed two people after minor provocation. Plaintiff also reported that he had been experiencing flashbacks and nightmares from the incident in 1999 when he fell into the grave. He claimed that he felt tired all the time with decreased appetite. Plaintiff was discharged on July 26, 2005, with a diagnosis by his treating psychiatrist, Yolla Jules, M.D., of impulse control disorder, alcohol dependence, polysubstance dependence, substance-induced psychotic disorder, antisocial personality disorder, and a Global Assessment of Functioning ("GAF")[2] score of 50. Medications upon discharge included drugs for high blood

---

[2]     A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

pressure, pain, and psychosis (quetiapine fumarate).  (Tr. 189-98.)

Upon discharge, Plaintiff began participating in a substance abuse treatment program.  The record includes a report by registered nurse Marilyn Sue Warren, R.N., based upon an Addiction Severity Index interview conducted on August 2, 2005. Plaintiff considered treatment for alcohol problems not very important to him, but treatment for drug problems and psychological problems very important.  The report states that Plaintiff was a professional fisherman, but was "too lazy" or did not have the entrance fee to enter tournaments in the last few years.  He also reportedly enjoyed swimming, playing basketball, bowling, and any outdoor sport.  Nurse Warren diagnosed cocaine dependence, alcohol dependence, antisocial personality traits, and a current and best GAF over the past year of 50.  Id. 226-40.  Plaintiff continued to be seen regularly for psychiatric and substance abuse counseling and medical management.

On June 30, 2006, state agency consulting psychologist L. Lynn Mades, Ph.D., examined and evaluated Plaintiff in connection with his application for disability benefits.  She noted that Plaintiff's attitude was generally cooperative and pleasant, that there was no unusual motor activity, that posture and gait were within normal limits, and that Plaintiff was spontaneous, coherent, relevant, and logical.  Plaintiff's mood was euthymic and his affect was slightly restricted but generally appropriate.  He had no preoccupations, thought disturbances, or perceptual distortions; auditory and visual hallucinations were denied; reality testing appeared adequate; flow of thought was logical and sequential; and suicidal and homicidal ideations were denied.  Dr. Mades noted that

4

Plaintiff reported doing household chores including sweeping, mopping, washing dishes, dusting, and cooking.

Dr. Mades diagnosed alcohol dependance, cocaine dependence, polysubstance dependence, depressive disorder not otherwise specified, antisocial personality disorder, and a current GAF of 70. She stated that although Plaintiff complained of depression and noted a few symptoms consistent with a depressive disorder, he did not appear depressed during the exam. She also stated that Plaintiff's records showed little evidence of mood difficulties but a considerable problem with substance use. She noted a history of behavior consistent with antisocial personality disorder, and believed that Plaintiff's prognosis was fair to good with abstinence from substance abuse. Id. at 247-52.

On June 30, 2006, Plaintiff was also seen for a physical evaluation by state-agency consultant Elbert Cason, M.D. Plaintiff told Dr. Cason that since his fall into the grave in 1999, he had pain in his left ankle and back. Plaintiff reported that he could walk five blocks, stand for one-half hour, sit for one-half hour, lift 40 pounds, and bend over. He used a cane and helped his mother, with whom he lived, with inside chores. On examination, Dr. Cason reported that Plaintiff had decreased range of motion of the back, with paravertebral tenderness. Straight leg raising on the left was decreased and caused left knee pain. Plaintiff could not heel stand, toe stand, or squat and his gait was with a decided limp on the left leg. Range of motion and flexion-extension of the back was 70 degrees; lateral flexion was 10 degrees bilaterally, with tenderness in the lumbar paravertebral area but no muscle spasms. Muscle strength was 5/5 on the right and 4/5 on

the left. Ankle and knee motions were decreased on the left. Wrist motion was normal, but there was numbness at the tip of the fifth right finger and the tip of the right index finger. Shoulder motions on the right were normal, but decreased on the left. The clinical impression offered by Dr. Cason was poorly regulated high blood pressure; low back pain since the 1980's with decreased range of motion of the back; hepatitis C; and arthritis in the back, left shoulder, right and left wrists, and left ankle, with decreased range of motion in the left ankle, lumbar spine, left knee, and left shoulder. Id. 253-60.

Non-examining state-agency consulting psychologist Judith McGee, Ph.D., completed a Mental RFC assessment on July 12, 2006, in which she opined that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions. She found no other significant limitations in mental activity. In an accompanying Psychiatric Review Technique form, Dr. McGee opined that Plaintiff was capable of simple work if he abstained from drugs and alcohol. Id. 261-76.

On July 27, 2006, Plaintiff was seen by Sudha Singireddy, M.D., who noted that Plaintiff's active problems included hepatitis C, pain in the left ankle and foot, tobacco use disorder, and hypertension. Plaintiff was taking Motrin for osteoarthritis of the left shoulder and back. He reported that he walked ten to 15 minutes daily. The progress notes stated: "ok with pain control. denies any other complaints. doing well." Plaintiff's hypertension was noted as controlled, his impulse control disorder was noted as stable, and he was scheduled for follow-up in six months. Id. 373-74.

On September 26, 2006, Plaintiff presented to the emergency room stating that he

6

was depressed and homicidal. He was hospitalized and he reported that he had been drinking and using cocaine every day for the past two weeks; he had been sober for several months until then, but had run out of his psychiatric medications and instead of going to the clinic, he "went back to his old habits." He stated that he felt violent and the previous day he fought with a man and broke the man's arm. He had not seen Dr. Jules, his treating psychiatrist, for six months and reported that when he took his medications he was "ok." On physical examination, Plaintiff reported periodic pain in his knees and right shoulder, and restricted movement in the knee joints. He had decreased sensitivity in the right hand and the second and third digits of the left hand. Plaintiff was diagnosed with substance-induced mood disorder with mixed features, alcohol dependence, cocaine dependence, antisocial personality disorder, and a GAF of 40 (noting that Plaintiff's last GAF on July 18, 2005, was 50).

Dr. Jules examined Plaintiff on September 28, 2006, and reported that his sleep and appetite were good, his thought process was organized and linear, he had no homicidal or suicidal ideation, and his insight and judgment were poor. She prescribed chloradiazepoxide (for anxiety) and continued detoxification. On September 29, 2009, Plaintiff's mood was "better" and he was discharged from the hospital to continue treatment as an outpatient. Id. 324-73.

The record includes progress notes dated October 2006 through April 2007 from a substance abuse treatment program in which Plaintiff participated. Id. 387-412. On April 19, 2007, Dr. Jules diagnosed impulse control disorder not otherwise specified, alcohol

dependence, cocaine dependence, and a current GAF of 50. She wrote that Plaintiff reported being compliant with his medications because when he was not he felt sick. Plaintiff's mood/affect was noted as normal, less irritable; and it was noted that he had no medication side effects. Id. 387-90.

September 13, 2007 x-rays showed a bunion on Plaintiff's left foot that required medical treatment, but no bone abnormality in the left foot; and a joint-space narrowing at the first metatarsal phalangeal joint of the right foot, with an impression of osteoarthritis at that joint. Id. at 431. On September 27, 2007, Plaintiff sought treatment for a rash (diagnosed as probable poison ivy) which had started several days earlier after Plaintiff mowed the lawn and pulled weeds.

**Evidentiary Hearing of October 4, 2007** (Tr. 27-49)

Plaintiff testified that he was currently living in a house with his mother. He had previously served in the Army and was receiving a ten-percent disability pension for hypertension. Plaintiff graduated high school and attended college for one year. He stated that he had received substance abuse treatment during the year before the hearing but had not received any type of vocational training or assistance in finding employment.

Plaintiff testified that he was last employed from 1999 to April 2004 driving and working as a laborer for the city parks. He resigned from this position because he could not do the work. His back kept "giving out" and his ankle would swell up. Prior to this job, he worked full time as a bus driver for two years. Plaintiff was terminated because the manager said he was unable to perform the work. Plaintiff explained that his back

kept giving him problems. He tried medications but that did not help, so he would work half a day and then go home.

Plaintiff testified that before working as a bus driver, he was employed as a machine operator for about one year. That job ended because the company he was working for lost a contract. He also had worked as a laborer for a cemetery for four months, a job which ended when the ground "gave out" and Plaintiff injured his back, shoulder, and ankle. Prior to that job, he worked for two and one half years as a tire technician, a job he quit due to back problems. Before that, Plaintiff worked for three years as a truck driver and as a laborer for three and a half years. He quit both of these jobs, stating with respect to the laborer job that he quit because of a bad back. The only other job he had held in the last 15 years was as a roll assembler for six months.

Plaintiff testified that pain in his ankle, knees, and back, and schizophrenia prevented him from being able to work. He had surgery on his ankle to repair his ligaments in 2004 and, according to Plaintiff, his ankle never healed properly. It would swell if he stood more than five minutes, lifted 25 pounds, walked for longer than ten minutes or so, or did not elevate his leg when sitting. Plaintiff testified that sometimes the swelling was accompanied by pain, which he described as a seven to eight on a scale of one to ten. He took Ibuprofen 800 mg/day for the pain and that worked sometimes. He also soaked the ankle and applied an analgesic cream.

Plaintiff said that he also had problems with both knees, his left knee, on which he had undergone arthroscopic surgery in 2000, being worse. The treatment for his knees

was basically the same as for his ankle. Plaintiff stated that his right knee retained fluid and that his doctor proposed surgery for that knee as well. Plaintiff testified that he had lower back problems such that it ached if he walked or stood "too much." His back would get weak and his legs would give out. He would get a sharp pain going down his left side. Plaintiff testified that he was using a cane because Dr. Singireddy told him to do so two years prior to the hearing to help with balance. Plaintiff testified that the amount of time he spent each day with his feet elevated depended upon how much pain he was feeling, but that it was at least half a day.

Plaintiff testified that Dr. Jules diagnosed him with schizophrenia, and that the medication he was put on, which he started taking in 2005, made him very sleepy and tired. He continued to be treated by Dr. Jules every two to three months, as he felt he needed. He stated that he had last used illegal drugs the previous November and the last time he drank alcohol was in January of 2007. He was currently in a substance abuse treatment program and was on probation until 2008.

Plaintiff said that he had a driver's license but that he did not drive because the medication he was taking made him too drowsy. He said that he got out every four or five months, when someone would take him to a relative's house. He did not attend church or any type of regular meetings or engage in any kind of outdoor activity. He was able to sweep, mop, and wash dishes at home because he could take his time. His sister did the grocery shopping for him.

Plaintiff testified that he suffered from explosive personality disorder that caused

problems when interacting with others. He explained that if he felt targeted or if someone were "messing" with him, he would get angry and physically violent. He had not physically attacked anyone in the past six months, but had in the last year -- someone he knew who kept "picking at me and just picking at me and I just blew up."

Plaintiff stated that most of the time he slept well. On a typical day, he would get up at about 6:00 a.m., take his medication, watch TV, make himself breakfast, and then dose off in his chair while watching TV. For lunch he might have a sandwich that he prepared. After lunch he would sit around and lay back on the bed until he got hungry or had to use the bathroom. He would prepare supper -- usually a sandwich and chips -- and after eating, went back to bed. He was moody, groggy, and sleepy due to his medications. Plaintiff testified that no friends visited him but that his cousin and brother would call to see how he was doing. Sometimes he went to the grocery store with his mother.

Plaintiff testified that he had not received any unemployment compensation or workers' compensation since 2004. He said that when he was using cocaine, he obtained it through friends with money he made panhandling. He explained that he was on probation due to a conviction in June 2006 for using cocaine.

**ALJ's Decision of October 18, 2007** (Tr. at 11-21)

The ALJ found that there was no reason to reopen or revise the May 6, 2004 determination that Plaintiff was not disabled. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 2, 2004, and

had the severe impairments of osteoarthritis of the first metatarsal phalangeal joint of his right foot, hypertension, hepatitis C, anti-social personality disorder, depression, and substance-induced mood disorder.   The ALJ found, however, that Plaintiff did not have an impairment or combination of impairments that met one of the deemed-disabling impairments listed in the Commissioner's regulations, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 ("Appendix 1").

With regard to the listings for mental disorders, the ALJ concluded that Plaintiff did not meet Listings 12.04 (affective disorders), 12.06 (anxiety related disorders), or 12.09 (substance addiction disorders) because he did not satisfy the  "B" criteria for these listings.[3]  In support of this conclusion, the ALJ found that Plaintiff's limitations of daily living were no more than mild; his social functioning limitations were no more than moderate; his difficulties of concentration, persistence, or pace were moderate; and there was no evidence that he had experienced any episodes of decompensation.  (Tr. 14-15.)

---

[3]    The listings for 12.04 and 12.06 set forth three criteria, "A," "B, and "C."  The required level of severity for Listing 12.04 is met when A and B are met, or when C is met.  The required level of severity for Listing 12.06 is met when A and B are met, or when A and C are met.  For B to be met in either of these listings, the individual must have marked difficulty in at least two of three functional areas (daily living; social functioning; and maintaining concentration persistence, or pace), or marked difficulty in at least one of these areas plus repeated episodes of decompensation, each of extended duration.  For Listing 12.04, C is a chronic affective disorder of at least two years' duration, with the presence of certain enumerated characteristics, that more than minimally affects functioning even under treatment.  For Listing 12.06, C is the complete inability to function independently outside one's home.

A substance addiction disorder (Listing 12.09) is deemed disabling if the requirements of any of nine listed conditions are met.

(Plaintff does not argue that the "criteria" were met.)

The ALJ determined that Plaintiff had the physical RFC to lift up to 50 pounds, lift 25 pounds frequently, and stand or walk up to six hours of an eight-hour work day. The ALJ noted that Plaintiff had been able to work for a number of years despite his impairments, and that the record did not indicate that any of Plaintiff's physical impairments worsened, or that he received significant treatment for them, after his alleged onset date. The ALJ stated that these facts undermined Plaintiff's allegation that the combination of his physical impairments was significant.

The ALJ also believed that the June 30, 2006 findings of Dr. Cason were inconsistent with Plaintiff's allegations of significant physical impairments, and that subsequent medical records did not indicate an increase in physical impairments. The ALJ found that although Plaintiff had a history of high blood pressure, there was no evidence that this resulted in complications such as heart disease or renal failure. Similarly, although Plaintiff was diagnosed with hepatitis C, the record did not indicate adverse symptoms associated with this diagnosis, such as fatigue.

The ALJ found no support by any treating medical professional for Plaintiff's allegation that prolonged time on his feet aggravated his foot pain and that nothing alleviated the pain. The ALJ noted that no treating physician ever found or imposed any long term, significant physical limitations on Plaintiff's functional capacity. The ALJ found that Plaintiff had a "fair range" of daily activities which undermined claims of significant physical limitations. The ALJ found that the daily activities in which the

record indicated Plaintiff could engage (sweeping, mopping, mowing, pulling weeds) were not limited to the extent one would expect given Plaintiff's complaints of disabling symptoms and limitations.

Turning to Plaintiff's mental impairments, the ALJ stated that the VA had awarded Plaintiff a ten percent disability for depression,[4] but that this finding was not binding on the ALJ. He stated that the medical record concerning Plaintiff's mental impairments was interspersed with documentation of ongoing drug and alcohol abuse. According to the ALJ, medical records from Plaintiff's hospitalization on July 18, 2005, did not indicate significant mental impairments, and the ALJ stated that he found this inconsistent with Plaintiff's allegations of significant mental impairments.

The ALJ stated that Plaintiff's GAF of 50 on July 18, 2005, and subsequent GAF scores of 50 were "at worst consistent with at minimum serious symptoms or a serious impairment in social, occupational, or school functioning such as the inability to keep a job." The ALJ stated that "a single or group of [GAF] score should not be used solely as a basis for a finding of disability," and found that other longitudinal medical evidence did not support the limitations generally associated with a GAF of 50. He noted that Plaintiff had not received regular medical treatment for mental problems between his alleged onset date and mid-2006, and that this undermined Plaintiff's allegations of a mental impairment. The ALJ then pointed to the June 30, 2006 findings of Dr. Mades, including

---

[4]    As noted above, the record shows that Plaintiff was rated 10 percent disabled due to hypertension, not due to depression. <u>Id.</u> 244.

a GAF score of 70, indicating no more than a slight impairment in social or occupational functioning.

The ALJ reviewed the records of Plaintiff's hospitalizations on July 27 and September 27, 2006, and Dr. Jules's notes from September 29, 2006. He stated that the fact that Plaintiff had not seen Dr. Jules for six months, along with "the seeming lack of compliance with his medications," undermined his allegations of mental impairments "at this time." The ALJ concluded as follows:

> Little from the medical records in the exhibit file indicates that the claimant's combination of mental impairments is severe enough to preclude her [sic] from performing all work available in the national economy. Although the claimant has been hospitalized for his mental impairments, the medical records do not document that any treating physician has ever found or imposed any long term, significant, and adverse mental limitations upon the claimant's functional capacity.
>
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The ALJ then stated that in comparing Plaintiff's RFC with the physical work required of a bus driver as that work was generally performed (and not as Plaintiff formerly performed it which reportedly required him to lift 50 pounds), Plaintiff was able to perform that job, and was thus not disabled.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm

the Commissioner's decision so long as it "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)).  Under this standard, the reviewing court must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citation omitted).

Reversal is not warranted, however, "as long as the ALJ's decision falls within the 'available zone of choice.'"  Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008) (citation omitted).  The decision of the ALJ is not outside the 'zone of choice' simply because a reviewing court might have reached a different conclusion had it been the initial trier of fact.  Id.  Rather, "if after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (citation omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520,

establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c) (3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix 1. If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If so, the claimant is not disabled. If not, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular exertional category of work (heavy, medium, light, and sedentary) listed in the Commissioner's regulations,

the Commissioner may carry this burden by referring to the Commissioner's Medical-Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional abilities. Where a nonexertional impairment, such as a mental impairment, significantly limits the claimant's ability to perform the full range of work in a particular category, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE on the availability of jobs that a person with the claimant's RFC and vocational factors could perform. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006).

### ALJ's Assessment of Plaintiff's Mental RFC

Plaintiff argues that the ALJ's RFC assessment was not proper as he ignored the GAF scores of 50 assessed by treating medical sources, and instead placed too much weight on the GAF score of 70 assessed by Dr. Mades, a consulting psychologist who examined Plaintiff only once. The Commissioner argues that the ALJ's determination was not based on Dr. Mades's GAF assessment of 70, but rather on the ALJ's belief that the record did not support the assessed GAF scores of 50.

A disability claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's

RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 7, 711 (8th Cir. 2001); see also Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the Court agrees with Plaintiff that the ALJ's determination that Plaintiff's mental impairments had no effect on his RFC is not supported by substantial evidence in the record as a whole. Courts, including the Eighth Circuit routinely consider GAF scores very instructive, if not controlling. See Pate-Fires, 564 F.3d at 944-45 (citing cases); Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (stating that a GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life, and . . . the VE considered a claimant with a GAF of 50 unable to find any work"); Wilson v. Astrue, 493 F.3d 965, 968 (8th Cir. 2007) ("GAF . . . scores are certainly pieces of the hypothetical puzzle necessary to gain an accurate overall assessment of [a claimant's] functioning"); Lacroix v. Barnhart, 465 F.3d 881, 883-84

(8th Cir. 2006) (considering DSM-IV's explanation of the meaning of various GAF scores in assessing claimant's mental abilities).

The Court discerns no valid basis for the ALJ's discounting the GAF scores assessed by Dr. Jules from July 25, 2005, to as late as April 19, 2007, when Plaintiff was compliant with his medications.  See Pate-Fires, 564 F.3d at 945 (holding that substantial evidence did not support ALJ's decision that the plaintiff was not disabled where the claimant had a history of GAF scores at 50 or below, despite one score of 58).  The ALJ's statement that medical records from Plaintiff's psychiatric hospitalization in July 2005 did not indicate significant mental impairments is difficult for this Court to understand. The Court believes that in suggesting that Plaintiff's GAF assessments by medical sources were too low, the ALJ was making his own independent medical findings, something an ALJ is not permitted to do.  See id. at 946-47.

Further, the fact that no treating mental health professional physician imposed any functional limitations on Plaintiff "cannot be used as substantial evidence that [Plaintiff] is not disabled" because none were asked to express an opinion on the matter.  See id. at 943-44 (citing Lauer, 245 F.3d at 705 (indicating that the absence of an opinion by claimant's first psychiatrist that claimant was unable to engage in work-related activities did not constitute substantial evidence supporting ALJ's findings where that psychiatrist was never asked to express an opinion about that issue,  especially as the psychiatrist did not state that the claimant could engage in full-time employment and did not discharge him from treatment)).

The Court believes that a remand is required for the ALJ first to reconsider Plaintiff's RFC with regard to Plaintiff's mental impairments, developing the record further if necessary, and then to continue with the next steps of the sequential evaluation process.[5]

## ALJ's Assessment of Plaintiff's Physical RFC

Plaintiff also argues that the ALJ's RFC assessment improperly failed to include the range of motion limitations reported by Dr. Cason, and Plaintiff's postural and endurance limitations indicated in the record. Indeed, the ALJ did not discredit the range of motion limitations but also did not factor them into the RFC assessment. Upon remand, the ALJ must consider Plaintiff's mental and physical impairments in combination "without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling." See Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000).

## Plaintiff's Ability to Perform His Past Relevant Work

Plaintiff argues that in determining that Plaintiff could perform his past work as a bus driver, the ALJ erred in failing to make explicit findings as to the mental demands of

---

[5] The Court notes that under the Social Security Act, "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The Commissioner's regulations, 20 C.F.R. § 404.1535(b), detail how an ALJ is to evaluate if substance abuse is material in determining disability. See Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003). While this would seem to be a case that was appropriate to consider under these regulations, the ALJ did not do so.

that job.  This argument is subsumed in the discussion above regarding Plaintiff's mental

RFC.  As a general matter, the Court notes that at step four of the evaluation process, in

determining whether a claimant can perform his past relevant work, the ALJ must

compare the limiting effects of the claimant's impairments with the demands of such

work.  See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED** and the case is **REMANDED** to the Commissioner for further

consideration.

A separate Judgment shall accompany this Memorandum and Order.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of September, 2009.